Nos. 2024-2240, 2024-2241

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

NETLIST, INC.,

*Appellant*,

v.

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., MICRON TECHNOLOGY
TEXAS, LLC,

*Appellees.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2022-01427, IPR2022-01428,
IPR2023-00882, IPR2023-00883

**APPELLEES' RESPONSE BRIEF**

April 16, 2025

Michael Hawes
Lori Ding
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1234 (telephone)
michael.hawes@bakerbotts.com
lori.ding@bakerbotts.com

Eliot Williams
BAKER BOTTS L.L.P.
700 K Street, NW

Michael R. Rueckheim
WINSTON & STRAWN LLP
225 Shoreline Drive, Suite 520
Redwood City, CA 94065
(650) 858-6500 (telephone)
MRueckheim@winston.com

Juan Yaquian
WINSTON & STRAWN LLP
800 Capitol St., Suite 2400,
Houston, TX 77002-2925
(713) 651-2645 (telephone)

Washington, DC 20001
(202) 639-7700 (telephone)
eliot.williams@bakerbotts.com

Theodore W. Chandler
BAKER BOTTS L.L.P.
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
(213) 202-5702 (telephone)
ted.chandler@bakerbotts.com

*Attorneys for Samsung Electronics
Co., Ltd.*

jyaquian@winston.com

*Attorney for Micron Technology Inc.,
Micron Semiconductor Products, Inc.,
and Micron Technology Texas, LLC*

## PATENT CLAIM LANGUAGE AT ISSUE

### U.S. Patent No. 8,787,060
### [Appx192-93]

**1.**     [1.a] A memory package, comprising:

[1.b] a plurality of input/output terminals via which the memory package communicates data and control/address signals with one or more external devices;

[1.c] a plurality of stacked array dies including a first group of array dies and a second group of at least one array die, each array die having data ports;

[1.d.1][1] at least a first die interconnect and a second die interconnect, the first die interconnect in electrical communication with the first group of array dies and not in electrical communication with the second group of at least one array die,

[1.d.2] the second die interconnect in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies; and

[1.e.1] a control die comprising

[1.e.2] at least a first data conduit between the first die interconnect and a first terminal of the plurality of input/output terminals,

[1.e.3] and at least a second data conduit between the second die interconnect and the first terminal, the first terminal being a data terminal,

[1.e.4] the control die further comprising a control circuit to control respective states of the first data conduit and the second data conduit in response to control signals received via one or more second terminals of the plurality of terminals.

---

[1] These limitation labels match those used in the record by the Board, Petitioner, and Netlist.  Appx74; Appx11023-26; Appx11412; Appx6; Appx212; Appx585.  Netlist's opening brief on appeal combines some of these labels (e.g., Netlist replaces [1.d.1] and [1.d.2] with just 1[d], etc.).  *See* Br. 12-14.

**7.**     [7.a] The memory package of claim 1, wherein a first number of array dies in the first group of array dies and a second number of at least one array die in the second group of at least one array die are selected in consideration of a load of the first die interconnect and a load of the second die interconnect so as to reduce a difference between a first load on the first data conduit and a second load on the second data conduit,

[7.b] the first load including a load of the first die interconnect, and a load of the first group of array dies, and the second load including a load of the second die interconnect and a load of the second group of at least one array die.

**15.**     [15.a] The memory package of claim 11, wherein: the first data conduit comprises at least a first driver having a first driver size, and the second data conduit comprises at least a second driver having a second driver size, and

[15.b] wherein the first driver size and the second driver size are both less than a driver size sufficient to drive a signal along a die interconnect in electrical communication with each of the plurality of array dies without significant signal degradation.

### U.S. Patent No. 9,318,160
### [Appx169]

**1.**     [1.a] A memory package, comprising:

[1.b] data terminals and control terminals;

[1.c] stacked array dies including a first group of array dies and a second group of at least one array die;

[1.d.1] first die interconnects and second die interconnects, the first die interconnects in electrical communication with the first group of array dies and not in electrical communication with the second group of at least one array die,

[1.d.2] the second die interconnects in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies; and

[1.e.1] a control die comprising

[1.e.2] first data conduits between the first die interconnects and the data terminals, and

[1.e.3] second data conduits between the second die interconnects and the data terminals,

[1.e.4] the first data conduit including first drivers each having a first driver size and configured to drive a data signal from a corresponding data terminal to the first group of array dies,

[1.e.5] the second data conduit including second drivers each having a second driver size and configured to drive a data signal from a corresponding data terminal to the second group of at least one array die, the second driver size being different from the first driver size.

FORM 9. Certificate of Interest                                    Form 9 (p. 1)
                                                                    March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-2240 |
| **Short Case Caption** | Netlist, Inc. v. Samsung Electronics Co., Ltd. |
| **Filing Party/Entity** | Samsung Electronics Co., Ltd. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/23/2024                Signature:  /s/ Michael Hawes

                                Name:       Michael Hawes

FORM 9. Certificate of Interest

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| Samsung Electronics Co., Ltd. | Samsung Semiconductor, Inc. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

---

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Brianna Potter<br>Baker Botts L.L.P. | Ferenc Pazmandi<br>Baker Botts L.L.P. | Michael Knierim<br>Baker Botts L.L.P. |
| | | |
| | | |

---

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)   ☐   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 24-2240 |
| **Short Case Caption** | Netlist, Inc. v. Samsung Electronics Co., Ltd. |
| **Filing Party/Entity** | Micron Technology, Inc., Micron Semiconductor Products, Inc., Micron Technology Texas, LLC |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/03/2024

Signature: /s/ Michael R. Rueckheim

Name: Michael R. Rueckheim

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Micron Technology, Inc. | | |
| Micron Semiconductor Products, Inc. | | Micron Technology, Inc. |
| Micron Technology Texas, LLC | | Micron Technology, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable              ☐   Additional pages attached

| | | |
|---|---|---|
| Winston & Strawn | | |
| Matthew Hopkins | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)   ☐   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable              ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES.................................................................1

INTRODUCTION ....................................................................................1

STATEMENT OF THE CASE..................................................................3

    I.     Summary of the prior art and Netlist's patents ....................................3

          A.     Level of ordinary skill includes knowledge of JEDEC standards.........................................................................3

          B.     JEDEC standards for avoiding collisions ....................................3

          C.     Rajan and the "fork-in-the road" layout for reducing load.........7

          D.     Kim and TSVs for stacked memory devices .............................10

          E.     Combination of Kim and Rajan (part of '060 Grounds 1-3 and '160 Ground 1)....................................................................12

          F.     Riho (part of '060 Ground 2 against claim 7)...........................14

          G.     Wyman (part of '060 Ground 3 against claim 15, and '160 Ground 1 against all claims) .....................................................15

          H.     Netlist's '060 and '160 patents ................................................17

          I.     Lack of secondary considerations of non-obviousness ...........20

    II.    The IPR proceedings ...........................................................................21

SUMMARY OF ARGUMENT ...............................................................22

ARGUMENT ..........................................................................................24

    I.     Standard of Review ...........................................................................24

    II.    The Board correctly found that the combination of Kim and Rajan teaches a "*first group of [multiple] array dies*" with a "*first die interconnect*," and a "*second group of at least one array die*" with a separate "*second die interconnect*," as required by claim 1 of the patents ..................................................................................25

          A.     Substantial evidence supports the Board's findings of a motivation to combine Kim and Rajan .....................................29

                 1.     Kim does not teach away from multiple "*array dies*" sharing the same "*die interconnect*" by using separate chip-select signals as taught by Rajan, and Netlist forfeited any argument to the contrary ..............33

2.  The combination with Rajan does not "eviscerate" Kim's invention or purpose, and Netlist forfeited its arguments to the contrary ..........................................41

3.  The Board's findings about the motivations to connect multiple memory dies to Kim's TSVs were not "generic," and Netlist forfeited any argument to the contrary..................................................46

4.  Substantial evidence supports the Board's findings that data collisions were avoidable, as expressly taught by Rajan................................................................49

B.  Substantial evidence supports the Board's findings about the reasonable expectation of success in combining Kim and Rajan without data collisions .............................51

III.  Claim 7 of the '060 Patent....................................................................55

A.  Netlist forfeited its new claim construction argument, which is incorrect anyway and would exclude a preferred embodiment.................................................................56

B.  Substantial evidence supports the Board's finding that the combination of Kim, Rajan, and Riho taught claim 7 of the '060 patent..................................................................63

C.  Substantial evidence supports the Board's findings on the motivation to combine Riho with Kim and Rajan with a reasonable expectation of success............................................68

IV.  Substantial evidence supports the Board's findings for claim 15 of the '060 patent..................................................................70

V.  The Board's analysis of undisputed claim limitations was proper ...........................................................................................73

CONCLUSION ......................................................................................74

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Almirall, LLC v. Amneal Pharms. LLC*,
  28 F.4th 265 (Fed. Cir. 2022)................................................................24

*Bot M8 LLC v. Sony Interactive Ent. LLC*,
  66 F.4th 1380 (Fed. Cir. 2023)............................................... 64, 66, 73

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
  4 F.4th 1370 (Fed. Cir. 2021)..............................................................45

*ClassCo, Inc. v. Apple, Inc.*,
  838 F.3d 1214 (Fed. Cir. 2016)............................................. 44, 50, 55

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ...........................................................................24

*Consolo v. Fed. Maritime Comm'n*,
  383 U.S. 607 (1966) ...........................................................................25

*Corephotonics, Ltd. v. Apple Inc.*,
  84 F.4th 990 (Fed. Cir. 2023).......................................................53, 54

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009)...........................................................35

*Elekta Ltd. v. ZAP Surgical Sys., Inc.*,
  81 F.4th 1368 (Fed. Cir. 2023)...........................................................52

*Genentech, Inc. v. Hospira, Inc.*,
  946 F.3d 1333 (Fed. Cir. 2020)...........................................................25

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) ...............................................................................25

*Honeywell Int'l Inc. v. 3G Licensing, S.A.*,
  124 F.4th 1345 (Fed. Cir. 2025).........................................................69

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
  849 F.3d 1034 (Fed. Cir. 2017)...........................................................68

iii

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) .............................................................38

*In re Cree, Inc.*,
  818 F.3d 694 (Fed. Cir. 2016) ...............................................................73

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ...................................................... 24, 25

*In re Google Tech. Holdings LLC*,
  980 F.3d 858 (Fed. Cir. 2020) ...................................................... passim

*In re Harza*,
  274 F.2d 669 (CCPA 1960)....................................................................72

*In re Riggs*,
  131 F.4th 1377 (Fed. Cir. 2025) ............................................................45

*Integrated DNA Techs., Inc. v. Pillar Biosciences, Inc.*,
  No. 22-2172, 2024 WL 5182912 (Fed. Cir. Dec. 20, 2024) ...............................58

*Intel Corp. v. PACT XPP Schweiz AG*,
  61 F.4th 1373 (Fed. Cir. 2023) ..............................................................69

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 784 (Fed. Cir. 2021) ...............................................................46

*IOENGINE, LLC v. Ingenico Inc.*,
  100 F.4th 1395 (Fed. Cir. 2024) ............................................................56

*Kaufman v. Microsoft Corp.*,
  34 F.4th 1360 (Fed. Cir. 2022) ..............................................................63

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .......................................................... 25, 33, 46, 48

*Medtronic, Inc. v. Teleflex Innovations, S.à.r.l*,
  69 F.4th 1341 (Fed. Cir. 2023) ..............................................................45

*Paice LLC v. Ford Motor Co.*,
  881 F.3d 894 (Fed. Cir. 2018) ........................................................ 68, 73

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
  773 F.3d 1186 (Fed. Cir. 2014) ...........................................................25

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005) .............................................................59

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
  882 F.3d 1056 (Fed. Cir. 2018) ...........................................................73

*Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*,
  24 F.4th 1406 (Fed. Cir. 2022) ............................................................73

*Randall Mfg. v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013) ...........................................................25

*Rembrandt Diagnostics, LP v. Alere, Inc.*,
  76 F.4th 1376 (Fed. Cir. 2023) ............................................................54

*Soft Gel Techs., Inc. v. Jarrow Formulas, Inc.*,
  864 F.3d 1334 (Fed. Cir. 2017) ................................................... 38, 64

## Statutes

5 U.S.C. § 706 ..........................................................................................64

## Other Authorities

Allen Pusey, *US Railroads Enact Standard Time Zones*,
  105 A.B.A. J. 72 (Winter 2019-2020) .....................................................4

https://www.merriam-webster.com/dictionary/respectively ....................36

## STATEMENT OF RELATED CASES

No appeal in or from the same action was previously before this or any other appellate court.  Below are cases known to counsel to be pending in any tribunal that will directly affect or be affected by this Court's decision in the pending appeal:

1.  *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, No. 24-2203 (Fed. Cir.) (appeal from No. 2:21-cv-00463 (E.D. Tex.))

2.  *Samsung Electronics Co., Ltd. et al. v. Netlist, Inc.*, No 1:21-cv-01453-RGA-JLH (D. Del.)

3.  *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, No. 8:20-cv-00993-MCS-ADS (C.D. Cal.)

4.  *Netlist, Inc. v. Micron Technology, Inc. et al.*, No. 2:22-cv-00203-JRG (E.D. Tex.)

On September 12, 2024, this Court ordered that this appeal and the following related appeals be treated as companion cases and assigned to the same merits panel: Nos. 24-1707, 24-1859, 24-1863, and 24-2203 (above).  *See* ECF No. 15.

## STATEMENT OF THE ISSUES

1.    Whether Netlist forfeited the teaching away and claim construction arguments it now makes on appeal.

2.    Whether Netlist identifies any prejudicial errors in the Board's determination that Samsung established by a preponderance of the evidence that the subject matter of claims 1-34 of the '060 patent and claims 1-20 of the '160 patent would have been obvious to one of ordinary skill in the art.

## INTRODUCTION

In the underlying IPR proceedings, Netlist attacked the ***wrong*** combination—a combination Petitioner never proposed in which no additional changes would be made to Kim beyond simply adding more "ranks" of memory chips.  Appx107 ("Dr. Brogioli's ***assumption of no change*** in operation [of Kim] with the addition of two ranks . . . .");[2] Appx39 (same).  Based on this erroneous assumption, Netlist argued that skilled artisans would have neither the motivation nor the ability to combine Rajan and Kim.  But "this is not the proposed combination" that was raised by Petitioner.  Appx100; Appx32.  Netlist "fail[ed] to account for the combined teachings of Kim and Rajan and the knowledge and skill of a person of ordinary skill in the art."  Appx107; Appx39.  Petitioner's actual combination was "a straightforward one — 'implement a shared data bus for multiple memory chips as

---

[2] All emphases added unless otherwise noted.

1

taught by ***Rajan*** . . . using, e.g., Kim's TSV interconnects.'" Appx99-100 (alteration in original); Appx31-32.  And as the Board thoroughly and correctly analyzed, skilled artisans would have been motivated and able to combine Rajan with Kim as Petitioner proposed.  Appx100-09; Appx32-41.

On appeal, Netlist presents a wide array of arguments on why the Board erred in its analysis of the motivation to combine.  *See* Br. 37-55.  These arguments are equally flawed because they, too, are based on the same ***wrong*** combination of Rajan and Kim that Petitioner did not propose.  Moreover, Netlist forfeited many of those arguments, having failed to raise them in the underlying IPR proceedings.

Netlist also challenges the Board's analysis of claim 7 of the '060 patent based on a new claim construction that Netlist did not advance, and thus forfeited, in the underlying IPR proceeding.  *See* Br. 56-59.  Even if Netlist's new arguments are considered, they fail because they improperly (i) inject a process step into an apparatus claim, (ii) re-write claim 7 to exclude a preferred embodiment, and (iii) assume prejudicial error without explanation.

Finally, Netlist challenges the Board's obviousness findings for claim 15 of the '060 patent, which requires two separate "drivers."  *See* Br. 64-67.  But Netlist merely rehashes the same arguments from the IPR that the Board considered and rejected in light of credible expert testimony and the Wyman reference showing that two separate drivers was a known option.  Appx132-35.

2

In addressing obviousness for each claim, the Board provided readily discernible reasoning and properly identified the basis for its findings and conclusions, which should be affirmed.

## STATEMENT OF THE CASE

### I.   Summary of the prior art and Netlist's patents

#### A.   Level of ordinary skill includes knowledge of JEDEC standards

Netlist's brief overlooks the level of ordinary skill in the art found by the Board, which Netlist does not challenge on appeal.  *See, e.g.*, Br.[3] 1-12.  The Board found that a person of ordinary skill in the art (POSITA) "would have been familiar" with "*JEDEC* (Joint Electron Devices Engineering Council) *industry standards*, DRAM (dynamic random access memory) and SDRAM (synchronous DRAM) memory modules" as well as "the structure and operation of circuitry used in *stacked* memory devices."  Appx75-77; Appx7-9.  That knowledge of JEDEC standards and stacked memory devices is important to how a person of ordinary skill in the art would understand the prior art and the asserted patents, as discussed below.

#### B.   JEDEC standards for avoiding collisions

Memory devices typically send and receive data over *bi-directional* data lines labeled "DQ."  *See, e.g.*, Appx3758 ("DQ . . . Data Input/Output: *Bi-directional* data bus").  A consequence of bi-directional data lines is the need to avoid *collisions*

---

[3] Appellant Netlist, Inc.'s Principal Brief (hereinafter "Br.").

between the data traveling in the read direction and the data traveling in the write direction.  The problem is like two trains on the same track, which would collide into each other if they did not take turns at the correct time.  The railroad industry solved that problem in the 1800s by ensuring all trains operated according to the same clock, what we now call Standard Time.  *See, e.g.*, Allen Pusey, *US Railroads Enact Standard Time Zones*, 105 A.B.A. J. 72 (Winter 2019-2020).  The electronics industry's solution was to create what is known as the JEDEC standards.

The JEDEC standards avoid collisions using programmable "latency" parameters (e.g., 5, 6, 7, 8, or 9 clock cycles) that fine-tune the timing for read and write operations. The JEDEC standards also include detailed timing diagrams showing how to perform different sequences of commands without collisions.  For example, below is a timing diagram for a write command (i.e., data going to the memory) followed by a read command (i.e., data coming from the memory) using the same bi-directional DQ data line, where "write latency" (WL) has been set to 5 clock cycles and "read latency" (RL) has been set to 5 clock cycles, resulting in a sufficient gap of time between the two commands so that the last piece of write data does not collide with the first piece of read data coming back in the opposite direction on the same DQ data line:

4



**Figure 53 — WRITE (BL8) to READ (BC4/BL8) OTF**

Appx10712-13 (annotating Appx3819); Appx11542-43 (similar); Appx712-13 (similar); Appx9710-11 (110:5-111:16) (discussing Appx3768-69); Appx9716-17 (116:2-117:9) (discussing Appx3807-08, Appx3818-19); Appx3772 (defining "Read Latency (RL)" and "Write Latency (WL)"); Appx4418 (explaining "flexibility" provided by "programmable . . . latency"). These "latency" parameters prevent the write data and the read data from occupying the bi-directional data lines at the same time, thus preventing data collisions.

The JEDEC standards also disclose how to **_stack_** memory devices, where the memory devices in the stack (e.g., the four large rectangles below) all **_share_** the same bi-directional DQ data lines (green below):



Figure 2 — Qual-stacked / Quad-die DDR3 SDRAM x8 rank association

EX1019 at 12

Table 6 — Command Truth Table

| Function | Abbrevia tion | CKE | | CS# | RAS# | CAS# | WE# | BA0-BA2 | A13-A15 | A12-BC# | A10-AP | A0-A9, A11 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Previous Cycle | Current Cycle | | | | | | | | | | |
| Mode Register Set | MRS | H | H | L | L | L | L | BA | OP Code | | | | |
| Write (Fixed BL8 or BC4) | WR | H | H | L | H | L | L | BA | RFU | V | L | CA | |
| Read (Fixed BL8 or BC4) | RD | H | H | L | H | L | H | BA | RFU | V | L | CA | |
| Device Deselected | DES | H | H | H | X | X | X | X | X | X | X | X | 11 |

EX1019 at 33

Appx10711 (annotating Appx3757, Appx3778); Appx11054-55, Appx11542
(similar); Appx243-44, Appx712 (similar); Appx9901-04 (301:8-304:15);
Appx3758 ("Chip Select . . . CS# provides for external Rank selection on systems
with multiple Ranks."). When multiple memory devices share a set of data lines,
data collisions may also occur when two or more memory devices attempt to use the
shared data lines at the same time. To prevent such data collision, the JEDEC
standards provide another mechanism called the "chip-select" signal ("CS" in red

above). *Id.* The chip-select signal can be used to selectively allow only one memory device to use the shared data lines at a time, thereby preventing data collisions.

Unsurprisingly, given the JEDEC standards above, it is undisputed that a POSITA was capable of avoiding collisions and would have been motivated to do so:

> Q. It was also known to a person of ordinary skill in the art that multiple chips in different ranks could share the same data line without causing collisions, correct?
>
> A. In certain conte[x]ts, correct.
>
> . . . .
>
> Q. And, in general, a person of ordinary skill in the art would be motivated to avoid collisions and loss of data; is that fair?
>
> A. As we have talked about earlier today and yesterday, in a general sense, I think that's -- that's fair.

Appx9915 (315:20-:24), Appx9918 (318:1-:6); *see also* Appx6924-25 (69:24-70:18) ("Data collision is always avoidable.").

## C. Rajan and the "fork-in-the road" layout for reducing load

The "Rajan" prior-art reference was part of the obviousness combination for all Grounds in both IPRs. Appx70-71; Appx2-3. Rajan teaches stacking four memory devices on top of a "buffer chip" (green below) that has a ***shared*** I/O-circuit for data, where two memory devices (orange) ***share*** one bi-directional data bus (415A, teal), and the other two memory devices (yellow) ***share*** another bi-directional data bus (415B, light green), and chip-select signals (on the left, not

specifically shown) are used to select one memory device at a time, consistent with

the JEDEC standards discussed above—all without creating data collisions:



**FIG. 4**

Appx10747 (annotating Appx3646 and Appx3660); Appx11056 (similar); Appx245

(similar); Appx3662 (4:20-:24) ("may comply with [JEDEC] standards"),

Appx3667 (14:6-:11); Appx3668 (15:3-:12) ("any type of memory"); Appx3663

(6:30-:38) ("individually select the DRAM chips, utilizing separate chip select

signals (not shown) to each of the DRAM chips in the stack").

Petitioner described the layout above as a "***fork-in-the-road***" arrangement,

because data is routed along one of the two data busses at a time, similar to a railroad

switch.    Appx11058-59;  Appx247-48;  Appx10710;  Appx1361-63  (70:11-72:17);

Appx137-38; Appx62-63.  A benefit of the "fork-in-the-road" layout is that it can

reduce by half the electrical "load" on the data bus (e.g., reducing the load from four

memory devices on the same data bus down to two memory devices in the example

from Rajan above), and it can also avoid data collisions.  Appx11035-39; Appx222-

26.  As acknowledged by Netlist, "load" is a "physical phenomenon that limits the

number of memory dies that can be stacked, reduces performance, and results in

excessive power usage."  Br. 2.

Rajan includes several detailed timing diagrams for avoiding collisions in the

"fork-in-the-road" arrangement above, including the timing diagram below teaching

how to add a certain number of clock cycles to the memory operation, consistent

with the teachings of the JEDEC standard above (pp.4-7):



**FIG. 14**

Appx3656, Appx3666 (11:12-:14) ("FIGS. 14 and 15 are . . . illustrating methods of avoiding such collisions."); Appx9800-01 (200:2-201:11); *see also* Appx3651-57 (Figs.9-15); Appx11544-45; Appx714-16.

### D.    Kim and TSVs for stacked memory devices

The "Kim" prior-art reference was part of the obviousness combinations that the Board relied on in both IPRs.  Appx70-71, Appx142; Appx2-3, Appx67.  Kim teaches using through-silicon vias (TSVs) (teal and light green below) to implement data lines that transmit data signals to and from stacked memory devices (orange and

10

yellow below), with chip-select (CS) signals (not shown) to select one memory device at a time:



Appx11056 (annotating Appx3627); Appx245 (similar); Appx3631-32 ¶¶ 46-49.

Although Figure 5 of Kim above only illustrates *two* memory devices, Kim teaches that "*any number*" of memory devices may be used, with no requirement that each memory device has its own dedicated TSV rather than sharing a TSV with another memory device as taught by Rajan and the JEDEC standard. Appx3631 ¶ 48; *see also* Appx3632 ¶¶ 50-51 ("the embodiments described are by way of example only").

Kim teaches that there will be a "collision" *only* "[a]ssuming" that certain timing parameters have not been correctly set. Appx3631 ¶ 42; Appx6924-25 (69:24-70:18). Consistent with what was known in the prior art, Kim teaches that if

there is a sufficient "time interval" between the memory operations, then "a data collision does not occur." *Id.*; *see also* Appx3624-25, Appx3630 ¶ 31.

### E. Combination of Kim and Rajan (part of '060 Grounds 1-3 and '160 Ground 1)

The Petitions identified (and the Board agreed with) several motivations to combine the Kim and Rajan references above with a reasonable expectation of success. Appx11050-59 (citing Appx12018-30 ¶¶ 150-67); Appx239-48 (citing Appx2073-85 ¶¶ 146-63). As aptly summarized by the Board, the proposed combination was "a straightforward one — 'implement a shared data bus for multiple memory chips as taught by Rajan . . . using, e.g., Kim's TSV interconnects.'" Appx99-100; Appx31-32.

The Petitions explained that "a POSITA would be motivated to create a package with an interface that complied with the well-known JEDEC standards, as taught by Rajan." Appx11053; Appx242. Furthermore, "a POSITA would have been motivated to look at Rajan for the details about adding more memory chips in the stack (resulting, e.g., in four chips, yellow and orange, in two groups, as shown [above, p.8]), as suggested by Kim's disclosure that 'any number of … chips may be used.'" Appx11055; Appx244. The Petitions explained that another reference called Foster, shown below, confirmed that "[s]haring a TSV among two or more dies was a known option" and that there would be a motivation to share TSVs

"because it would not require creating new TSVs (which would add space and circuitry)":



FIG. 5

Appx11057 (annotating Appx4645); Appx246 (similar). The Petitions explained that "Figure 4 of Rajan teaches a similar arrangement as shown above [p.8], and a POSITA would have been motivated to implement that arrangement in Kim to preserve Kim's data collision avoidance feature without creating additional TSVs." Appx11059; Appx248. The Board agreed with the motivations to combine above and agreed that there was a reasonable expectation of success. Appx93-109; Appx25-41.

### F.    Riho (part of '060 Ground 2 against claim 7)

The "Riho" prior-art reference was relied on by the Board for certain claims, such as claim 7 of the '060 patent. Appx120-26. Riho, like Rajan and Kim, teaches stacking memory devices (e.g., orange and yellow below):



Appx11111 (annotating Appx3674). However, while the figures in Rajan and Kim (above on pp. 8 and 11) indicate that the data busses or TSVs connected to the different memory devices could have significantly *different* lengths, Riho teaches the benefit of making all the TSVs "substantially *equal* in length to each other," as shown in Figure 4 above, to reduce the difference in load and thus minimize "skew" in the data signals. Appx3684 ¶ 50; Appx11112; Appx11554-56; Appx12110-11 ¶ 341.

14

### G.    Wyman (part of '060 Ground 3 against claim 15, and '160 Ground 1 against all claims)

The "Wyman" prior-art reference was relied on by the Board for certain claims, such as claim 15 of the '060 patent. Appx126-35; Appx42-50. Wyman, like Rajan and Kim, concerns stacked memory devices. Wyman teaches that shorter TSVs (such as 802 below) require "minimal drive," while longer TSVs (such as 804 below) will have increased load and thus "require additional drive." Appx3705 (6:15-:26).



Appx10736-37 (annotating Appx3698); Appx11113-18 (citing Appx12034-39 ¶¶ 175-80, Appx12144-51 ¶¶ 456-71); Appx248-50 (citing Appx2086-91 ¶¶ 165-70), Appx265-69 (citing Appx2130-39 ¶¶ 255-66).

For shorter TSVs, like 802 above, Wyman explains that "utilizing the full capacity of a driver would be both wasteful and inefficient since far less power is required." Appx3703 (1:22-:24). But even for longer TSVs, like 804 above, Wyman teaches that "the total drive . . . would be overkill." Appx3705 (6:44-:50). Thus,

Wyman teaches that "the output drive current [can] be modified to meet the requirements of a particular output load." Appx3706 (7:13-:18). For example, Wyman teaches using different physical sizes and numbers of transistors to achieve different driver sizes, as illustrated below:



EX1017 (Wyman) at Figs. 3-5

Appx10734 (annotating Appx3697-99); Appx11556-58; Appx722-24; Appx6983-87 (128:22-132:19). Wyman also teaches enabling a different number of transistors to achieve a different driver size, as illustrated below:



Appx10735 (annotating Appx3699); Appx9927-29 (327:11-329:15).

## H. Netlist's '060 and '160 patents

Netlist's '160 patent is a continuation of its '060 patent, so they share the same specification. Appx147; Appx171. For simplicity, the following discussion cites only to the '060 patent.

Netlist's patents admit that stacking memory devices was known in the prior art, as shown by Figures 1A and 1B, which illustrate prior-art examples:

17



**FIG. 1B**

Appx11041 (annotating Appx173); *see also* Br. 4 (similar); Appx181 (1:30-2:15). In the example above, ***all*** the array dies (yellow) share the same "die interconnect" (light green), which can be a "TSV" or "wire bonds," *see* Appx183 (5:51-:53).

Similar to what was previously proposed by Rajan and Kim above (pp.8, 11), Netlist's patents propose connecting ***one*** shared I/O circuit for "DQ" data to ***two*** "die interconnects" (e.g., TSVs) for data, thus reducing the load on each "die interconnect," as shown in the example below, where there are ***two*** "die interconnects" (teal and light green) each connected to ***two*** of the four array dies (orange and yellow, respectively):

18



Array Dies 210c and 210d
(orange)

Die interconnect 220b
(teal)

Array Dies 210a and 210b
(yellow)

Die Interconnect 220a
(light green)

Drivers 234
(for data)

FIG. 2

Appx11043 (annotating Appx174); Appx183 (5:63-6:15), Appx184 (7:9-:21).

Netlist's patents do not purport to disclose any new solutions for avoiding "collisions" in the arrangement shown above. Instead, Netlist's patents just refer to what was already known in the prior art: "Controlling the command/address *time slots* and the data bus *time slots* enables the control dies 822 to *reduce or prevent signal collisions* caused by multiple memory packages 820 sharing the data path control lines 816 and the data bus 818." Appx191 (21:51-:56). Netlist's patents incorporate by reference admitted prior art such as U.S. Patent Nos. 7,619,912 and 7,532,537, Appx182 (4:11), Appx190 (19:45-:46), which teach "insert[ing] wait-time intervals or clock cycles to avoid collision," Appx9879-80 (279:16-280:6); *see*

19

*also* Appx4886 (21:28-:53), similar to what the JEDEC standards and Rajan taught in the prior art for avoiding collisions as discussed above (pp.4-7, 9-10).

As previously recognized by Riho and Wyman, Netlist's patents recognize that "as the physical size of a memory package shrinks, the load of a die interconnect becomes a non-negligible value relative to the load of the array dies. Thus, as memory packages become physically smaller, it becomes more important to consider the load of the die interconnect . . . ." Appx182 (4:43-:47). Therefore, similar to what was previously proposed by Riho above (pp.14-14), Netlist's patents propose that "the load on each conduit 332 and/or driver 334 may be ***substantially the same***," but Netlist's patents also recognize that "the load . . . may ***differ***" and that any "difference in the load" is merely "a design decision (e.g., to maintain a specific number of drivers)." Appx187 (14:4-:21). Accordingly, similar to what was previously proposed by Wyman above (pp.15-17), Netlist's patents propose that "[t]he size of the driver may be adjusted by the selection of the transistor size and/or number of transistors included in the driver." Appx189 (17:43-:45).

## I.    Lack of secondary considerations of non-obviousness

Netlist now asserts that the '060 and '160 patents show that Netlist "developed an innovative architecture for HBM and 3DS memory that ***solved the load problem*** and enabled a larger number of memory dies to be stacked in a high-speed memory package with reasonable power consumption." Br. 2; *see also* Br. 6 (similar). Netlist

also insinuates that "Netlist gave a presentation to Samsung regarding its '060 patent" and then "Samsung willfully infringed both patents." Br. 14.

But as the Board found—and Netlist does not challenge on appeal—assertions like that are unsupported and irrelevant here, because "the record does not contain any supportable arguments for objective indicia of non-obviousness." Appx111; Appx50. The truth is that Netlist's '060 and '160 patents merely claim what was already obvious from the prior art, as found by the Board.

## II.    The IPR proceedings

The Board wrote two Final Written Decisions, totaling 143 pages, that found all claims of the '060 and '160 patents obvious in light of the Grounds involving Rajan and Kim ('060 Grounds 1-3, and '160 Ground 1), without reaching another set of Grounds challenging all claims based on a different combination of prior art ('060 Grounds 4-5 and '160 Ground 2). Appx142; Appx67.

The Board wrote a lengthy analysis agreeing with Petitioner's proposed motivation to combine Rajan and Kim—resulting in two array dies connected to one die interconnect, and another two array dies connected to another die interconnect—and the Board disagreed with Netlist's contention that the combination would not work due to "collisions." Appx93-109, Appx137-39; Appx25-41, Appx62-64.

The Board agreed that the combination involving Riho—which teaches reducing the difference in the load on the two TSVs—rendered obvious claim 7 of

21

the '060 patent and other similar claims. Appx120-26. And the Board agreed that

the combination involving Wyman—which teaches different driver sizes for TSVs

with different loads—rendered obvious claim 15 of the '060 patent and other similar

claims. Appx126-35; Appx42-50. The Board also made other findings with respect

to other claims and issues. *See, e.g.*, Appx112-20, Appx136-41; Appx51-66.

Netlist filed requests for Director review of the Final Written Decisions,

Appx11841-42; Appx1392-93, which were summarily denied, Appx144-46.

## SUMMARY OF ARGUMENT

The Board assessed the ***combination*** of Rajan and Kim as a basis for

concluding that a skilled artisan would have found the claimed subject matter

obvious, i.e., connecting multiple memory array dies to a control die with an

interconnect while connecting another one or more memory array dies to the control

die with a separate interconnect. The Board found that Kim taught increasing the

number of memory array dies in separate groups, which would have motivated a

skilled artisan to adopt, with a reasonable expectation of success, Rajan's suggestion

of selective chip enablement when adding more memory array dies in each stack,

and, critically, that Netlist failed to dispute "there are a finite number of known ways

to connect additional dies, one of which being to have dies share a TSV." Appx94-

95; Appx26-27. For each of those findings, the Board cited the references' express

disclosures and expert testimony, and, based on those findings, the Board determined

that "Petitioner's combination is a straightforward one."  Appx99; Appx31.  That analysis should be affirmed.

The Board also addressed and rejected Netlist's arguments, and the expert testimony underlying them, that the Petition's combination is contrary to Kim's intended purpose and would result in data collisions.  Appx102-09; Appx34-41.  The Board found Netlist's expert unreliable and that those of ordinary skill knew how to deal with collisions, as confirmed by express disclosures of the prior art, including Rajan's explanations of timing various memory operations, as well as Samsung's expert testimony and Netlist's own patents.  Appx102-06; Appx34-38.  Netlist's attempt to go further on appeal by asserting "teaching away" (Br. 38-43) is forfeited and, in any case, runs afoul of the substantial evidence on which the Board relied in finding a motivation to combine and reasonable expectation of success.

For claim 7 of the '060 patent, Netlist forfeited its claim construction argument—which introduces a process step into an apparatus claim—by not raising it with the Board, and Netlist does not challenge the Board's findings under the plain and ordinary meaning of the claim language.  Even if Netlist's belated construction were considered, it is incorrect because it excludes a preferred embodiment, and in any event the combination teaches Netlist's newly proposed requirement such that Netlist identifies no harm flowing from its asserted error.

For the combination adding Wyman to Kim and Rajan for claim 15 of the '060 patent and other similar claims, Netlist asks this Court to reweigh a question of fact as to prior art disclosure. The Board rejected Netlist's position, relying on express language of Wyman teaching multiple driver circuit embodiments, and credited expert testimony as to how one of ordinary skill would have understood each. Appx126-35; Appx42-50. Netlist fails to identify any basis for reconsidering the Board's thorough analysis of the expert testimony and references.

Netlist's final grievance concerns various limitations and issues which it failed to dispute below. For each, the Board identified the arguments and evidence supporting its determination, more than commensurate with Netlist's treatment, and none of Netlist's cases support remanding where it fails to identify any harm.

## ARGUMENT

### I.    Standard of Review

This Court reviews the Board's legal conclusions de novo and factual findings for substantial evidence. *Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 271-72 (Fed. Cir. 2022). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding

from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"Whether a claimed invention is unpatentable as obvious under § 103 is a question of law based on underlying findings of fact." *In re Gartside*, 203 F.3d at 1316. Those underlying facts include the "scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). A finding as to the scope and content of the prior art is reviewed for whether "the Board reasonably found that a skilled artisan would have understood that [disclosure]." *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1340 (Fed. Cir. 2020). Whether there is a motivation to combine or modify references and whether there is a reasonable expectation of success are both questions of fact that the Court reviews for substantial evidence. *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1193, 1196-97 (Fed. Cir. 2014).

## II. The Board correctly found that the combination of Kim and Rajan teaches a "*first group of [multiple] array dies*" with a "*first die interconnect*," and a "*second group of at least one array die*" with a separate "*second die interconnect*," as required by claim 1 of the patents

Netlist's primary argument on appeal is that the Board erred in finding a motivation to combine Kim and Rajan, with a reasonable expectation of success,

25

resulting in claim 1 of the patents, which require "*a first group of [multiple[4]] array dies and a second group of at least one array die,*" where a "*first die interconnect[]*" is "*in electrical communication*" with "*the first group*" but not with "*the second group**,*" and a "*second die interconnect[]*" is "*in electrical communication*" with "*the second group*" but not with the "*first group*,*" as shown in the annotated figure from the prior-art Rajan reference below.  Br. 23-28, 34-55.



Appx85 (reprinting Appx11068 (annotating Rajan, Appx3646)); Appx17 (reprinting Appx258 (same)).

Contrary to Netlist's argument, substantial evidence supports the Board's finding that "Petitioner's combination is a straightforward one — 'implement a shared data bus for multiple memory chips as taught by Rajan [shown above] . . .

---

[4] The Board assumed without deciding that the "*first group*" must have ***multiple*** array dies.  Appx79, Appx84 n.9; Appx11-12, Appx16 n.9.

using, e.g., Kim's TSV interconnects.'"  Appx99-100 (quoting Appx11057); Appx31-32 (quoting Appx246).

The Board made numerous findings against Netlist on this issue spanning dozens of pages.  Appx83-109; Appx16-41.  For example, the Board found—and Netlist does not challenge on appeal—that Kim and Rajan are analogous art because they are both in the same field of memory packages including stacked memory chips as the '060/'160 patents.   Appx85-86 (citing Appx181 (1:18-:19), Appx192 (claim 1), Appx3627-28 (Fig.5, [0003]), Appx3661 (1:14-:16), Appx3644-48 (Figs.2-6)); Appx17-18 (similar).  With respect to Rajan, shown above, the Board found—and Netlist does not challenge on appeal—that Rajan discloses stacked chips including a buffer chip 413 (green "*control die*") and memory chips 417A-D (yellow and orange, rendering obvious the "*array die[s]*"[5]) organized into a "*first group*" and a "*second group*" (yellow and orange), each having two memory chips (417C-D, yellow; and 417A-B, orange) that share respective data lines 415B and 415A (light green "*first die interconnect*" and teal "*second die interconnect*").  *See* Appx85 (reprinting Appx11068 (annotating Rajan, Appx3646)); Appx17 (reprinting Appx258 (same)); *see also* Appx94 ("Patent Owner agrees"); Appx26-27 (same).

---

[5] Chips 417A-D in Rajan's Figure 4 are DRAM chips, which Netlist disclaimed from the scope of "*array dies.*"  Appx77; Appx9.  The Board found, however, and Netlist does not challenge on appeal, that Rajan and Kim also teach "array dies that are ***not*** DRAM."  Appx77-79, Appx88 (citing Appx3668 (15:3-:9)); Appx9-11, Appx20 (same).

Similarly, with respect to Kim, the Board found—and Netlist does not challenge on appeal—that Kim discloses, as shown below, a stack of dies including a main chip C0 (green "*control die*") and memory chips C1 and C2 (yellow and orange "*array die[s]*") organized into a "*first group*" and a "*second group*" (yellow and orange), each having a respective data line TSV1 and TSV2 (light green "*first die interconnect*" and teal "*second die interconnect*") to communicate data with the "*control die*" (green):



Appx110-11 (reprinting Appx11070 (annotating Kim, Appx3627)); Appx42 (reprinting Appx260 (same)); *see also* Appx82, Appx14 (similar).

As discussed further below, Netlist argues at length on appeal that the combination of Rajan and Kim above supposedly would not work due to "collisions"

on the shared data lines in the combination. *See, e.g.*, Br. 23-28, 32-33, 34-55. But Netlist's arguments assume the ***wrong*** combination, where there are four memory chips but only two chip-select signals, resulting in collisions. As recognized by the Board, "this is not the proposed combination." Appx100; Appx32. The proposed combination includes four "separate chip select signals" (one for each memory chip), thus preventing collisions. Appx107-08; Appx39-40. The Board extensively addressed Netlist's arguments about "collisions" and correctly rejected them. *See, e.g.*, Appx102-09 (rejecting Netlist's arguments at Appx11424-36, Appx11441, Appx11603-04, Appx1330-31 (39:15-40:11)), Appx136-39 (rejecting Netlist's arguments at Appx11424-36, Appx11597-98, Appx11611-12, Appx1327-28 (36:25-37:7), Appx1330 (39:3-:9), Appx1361 (70:16-:17)); Appx34-41 (rejecting Netlist's arguments at Appx597-609, Appx616-17, Appx777-78, Appx1330-31 (39:15-40:11)), Appx62-64 (rejecting Netlist's arguments at Appx597-609, Appx771, Appx785-86, Appx790, Appx1327-28 (36:25-37:7), Appx1330 (39:3-:9), Appx1361 (70:16-:17)). Those factual findings are entitled to deference on appeal.

## A. Substantial evidence supports the Board's findings of a motivation to combine Kim and Rajan

Netlist raises four arguments for why a POSITA would not have been motivated to "connect [***multiple***] memory dies to Kim's TSV1 and TSV2," as taught by Rajan. Br. 37-51. Substantial evidence, however, supports the Board's findings

about the motivation to combine Kim and Rajan, resulting in multiple memory dies connected to a given TSV, as summarized below.

The Board extensively considered Netlist's argument that "Kim discloses that 'each TSV is in [electrical] communication with only a ***single*** chip'" rather than ***multiple*** chips as required by the claims for the "*die interconnect*." Appx93; Appx25. The Board found that although the figure in Kim shows only *one* memory chip per TSV, Kim expressly states that "***any number*** of … [memory] chips may be used" in its stack. Appx93 (citing Appx3631 ¶ 48); Appx25 (same). The Board agreed with Petitioner's expert "that Kim's disclosure suggests having ***more*** than the two chips depicted in Figure 5 [above p.28]," and this disclosure "would have ***motivated*** a person of ordinary skill in the art 'to look at Rajan for details about adding more memory chips in the stack (resulting, e.g., in four chips . . . in two groups . . .)." Appx93-94 (citing Appx3631-32 ¶¶ 48, 50; Appx12025-26 ¶¶ 158-60); Appx25-26 (same, citing also Appx2080-81 ¶¶ 154-56).

Furthermore, the Board found that "Patent Owner ***does not dispute*** Petitioner's contention [Appx11057 (citing Appx12026-28 ¶¶ 161-63; Appx3663 (5:36-:43), Appx3644-48 (Figs.2-6))] that there are a ***finite*** number of known ways to connect additional dies, one of which being to have dies ***share*** a TSV" as shown by the Foster reference below and consistent with Rajan above (p.26):



FIG. 5

Appx94-96 (annotating Appx4645 (Fig.5) and citing Appx4649 (2:53-:56), Appx4652 (7:28-:54)); Appx27-28 (same, citing also Appx246; Appx2081-83 ¶¶ 157-59).

The Board found the testimony by Netlist's expert on this issue not credible for several reasons. Netlist's expert had testified that Rajan supposedly would not motivate a POSITA to connect multiple memory dies to Kim's TSV1 and TSV2 because Rajan supposedly "uses wire bonds" and supposedly "wire bonds ordinarily cannot be shared in the way that TSVs are shared." Appx98-99; Appx30-31. The Board did not credit this testimony by Netlist's expert because (i) it "d[id] not cite the Rajan reference on which Petitioner's challenge is based," which "does not state that its dies are connected with wire bonds," and instead cited a different reference

31

called Rajan137; (ii) it was "not helpful in explaining" why "a wire bond in Rajan would be different from the wire bonds that can be die interconnects in the ['060 and '160] patent[s]," *see* Appx183 (5:51-:53) ("Examples of ***die interconnects*** include, but are not limited to, through-silicon vias (TSV), conducting rods, ***wire bonds***, and pins."); and (iii) it relied on the assumption that wire bonds in the '060 and '160 patents "are wires ***internal*** to a die" which is inconsistent with the patents' express disclosure that wire bonds are examples of "die ***interconnects***" that connect one die to another die.  Appx98-99; Appx30-31.

The Board also rejected Netlist's attorney argument trying to differentiate a shared "data bus" in Rajan from a shared TSV in the Kim-Rajan combination, *see* Appx1356-57 (65:12-66:4).  The Board found that "implement[ing] a shared bus per Rajan using Kim's TSVs" is "consistent with the evidence of record."  Appx100 (citing Foster, Appx4649 (1:39-:42) ("connect the signals together with vias, effectively sending a bus of signal lines vertically through a stack of dies"), and 2:56-:64 ("TSVs will often be used to effect connection of bus signals from a substrate up through the die stack")); Appx32 (similar).

The Board concluded that "Petitioner's combination is a straightforward one — 'implement a shared data bus for multiple memory chips as taught by Rajan . . . using, e.g., Kim's TSV interconnects'" and "a person of ordinary skill in the art would have been motivated to implement [this combination] . . . in part because a

32

[POSITA] would have understood that there were a finite number of known ways to connect additional dies, including having a subset of dies sharing a through-silicon via (TSV)." Appx99-100; Appx31-32; *see also KSR*, 550 U.S. at 421 ("finite number"). The Board also found that a POSITA "would have been motivated to connect additional memory dies to Kim's TSV1 and TSV2 because it would not require creating new TSVs (which would add space and circuitry)." Appx101 (crediting Petitioner's expert, Appx12028 ¶ 164); Appx33 (same, crediting Appx2083 ¶ 160).

As discussed in more detail below, the Board also rejected Netlist's arguments about supposed "collisions" in the proposed combination because the Board "f[ou]nd persuasive Petitioner's contentions that persons of ordinary skill in the art knew how to deal with collisions." Appx102; Appx34.

### 1. Kim does not teach away from multiple "*array dies*" sharing the same "*die interconnect*" by using separate chip-select signals as taught by Rajan, and Netlist forfeited any argument to the contrary

Netlist's first argument against the motivation to combine is that the Board supposedly "Overlook[ed] that Kim ***Taught Away*** from Connecting Multiple Array Dies to Each TSV." Br. 38-43. But Netlist never made a "teaching away" argument to the Board, thus forfeiting the argument on appeal. *See, e.g.*, *In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020) (finding forfeiture because appellant "never presented these arguments to the Board").

Netlist's brief to the Board focused on a particular **embodiment** of Kim with one chip per TSV, *see* Appx11424-30; Appx597-603, but Netlist never argued that Kim ***taught away*** from the solution for how to connect multiple chips to a given TSV without collisions. The solution is to selectively enable ***each*** chip with its own ***separate*** "chip select" signal, as taught by Rajan and as found by the Board. Appx106-09 ("Rajan discloses . . . '***separate*** chip select signals (not shown) to ***each*** of the DRAM chips in the stack.'" (quoting Appx3663 (6:34-:38))); Appx38-41 (same). The use of separate chip-select signals for each chip, as taught by Rajan, which allows multiple chips to be connected to the same TSV without creating collisions, is illustrated below:



EX1015 (Rajan) at 6:34-:38 & Fig. 4

Appx10710 (annotating Ellsberry on the left, Appx4674, and Rajan on the right, Appx3646, Appx3663 (6:34-:38)); Appx11056, Appx11058 (similar); Appx11546-48 (similar); Appx245, Appx247 (similar), Appx717-19 (similar).

There is a difference between Kim not disclosing a known solution to a known problem, and Kim teaching away from that solution. Netlist never argued to the Board that "Kim teaches away" from using separate chip-select signals as taught by Rajan (and as taught by the JEDEC standard that a POSITA admittedly was familiar with, *supra* pp.5-7). Br. 37-43. Nor did Netlist argue to the Board that Kim "disparag[es]" the proposed combination, "discourage[s]" a skilled artisan, or leads in a direction "divergent" from the combination, as Netlist now insists on appeal. Br. 38. Netlist's argument to the Board merely mentioned the phrase "taught away" to describe the facts of another case, *DePuy Spine*, without ever arguing that Kim teaches away from separate chip-select signals for each chip. *See* Appx11429 (describing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326-28 (Fed. Cir. 2009)); Appx602-03 (same).

And contrary to Netlist's argument on appeal, the Board did not overlook Netlist's argument (the one Netlist now labels "teaching away"). The Board analyzed Netlist's argument in-depth and found that Netlist had analyzed the wrong combination: Netlist improperly assumed a combination using only *two* chip-select signals (CS0 and CS1) for four chips in four ranks, resulting in collisions, *see* Appx11424-30; Appx597-603, rather than *four* chip-select signals as Petitioner had actually proposed in light of Rajan to avoid collisions (shown directly above, p.34), *see* Appx107-08 (finding that Netlist's arguments against the combination

35

improperly assumed "four ranks but only two chip select signals," citing Appx9920 (320:12-:24)); Appx39-40 (same); *see also* Appx11549 ("fourth strawman argument"); Appx720 (same); Appx10710, Appx10724-26; Appx1303-05 (12:9-14:11), Appx1308-09 (17:24-18:23). Netlist never argued that Kim taught away from the ***actual*** combination proposed in the IPRs.

Netlist argues for the first time on appeal that Kim teaches away from multiple dies sharing a TSV because Kim supposedly "***requires*** a ***one-to-one*** correspondence between TSVs (data lines) and dies (ranks), disparaging the alternative." Br. 38. But Netlist never argued to the Board that such a "one-to-one" correspondence is "required" by or "essential" to Kim's invention, *see* Br. 38-40, thus forfeiting the argument on appeal, *see, e.g.*, *In re Google*, 980 F.3d at 863. Netlist tries to support its new "one-to-one" argument by pointing to a passing statement in Kim about a "plurality of data . . . lines ***respectively connected*** to [a] plurality of [memory] chips." Br. 39 (quoting Appx3629 ¶17). But the word "respectively" does not require a "one-to-one" correspondence—it just requires being in the same order, and it permits a "one-to-many" correspondence[6]—so, unsurprisingly, Netlist never cited this paragraph from Kim to the Board. Nor did Netlist ever argue to the Board that Kim's passing use of the word "respectively" required a "one-to-one"

---

[6] *See, e.g.*, <https://www.merriam-webster.com/dictionary/respectively> ("two children, Hunter . . . and Ashley . . . have 18 and 13 people assigned to their detail, respectively").

correspondence, as Netlist now argues extensively on appeal. Netlist's brief on appeal also points for the first time to other paragraphs of Kim that Netlist never cited to the Board. *See, e.g.*, Br. 40 (quoting Appx3629 ¶¶ 14, 26; Appx3630 ¶ 33). These newly cited paragraphs of Kim are directed to different "aspects" and "embodiments," none of which describes a "one-to-one correspondence" as being "required" or "essential" to Kim's invention. Appx3629 ¶ 14 ("In another aspect . . ."), ¶ 17 ("In still another aspect . . ."), ¶¶ 25-26 ("FIG. 2 . . . in accordance with one embodiment"); Appx3630 ¶ 33 ("FIG. 3 is . . . illustrating a detailed configuration . . . shown in FIG. 2").

Netlist also points to Figure 5 of Kim to support its new "one-to-one correspondence" argument, Br. 39, but again Kim makes clear that Figure 5 is just "one embodiment of the present invention." Appx3631 ¶ 47. And the Board considered Kim's Figure 5 and found, given Kim's express disclosure that "***any number*** of . . . chips may be used," Appx3631 ¶ 48, that Kim would have motivated a person of ordinary skill in the art to make the proposed combination with Rajan. *See supra* pp.29-33 (citing Appx93-94 (citing Appx3631-32 ¶¶ 48, 50; Appx12025-26 ¶¶ 158-60); Appx25-26 (same, citing also Appx2080-81 ¶¶ 154-56)).

Netlist's arguments confuse Kim's preferred embodiment (i.e., one chip per TSV) with "teaching away." *See* Br. 37-43. As this Court has emphasized, "[a] reference must be considered for everything that it teaches, not simply the described

37

invention or a preferred embodiment. . . . One of ordinary skill in the art is not an 'automaton.'" *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012). And given the deferential standard of review, "the mere fact that alternative conclusions can be drawn from the evidence is not relevant to determining whether substantial evidence supports the Board's conclusion. The substantial evidence inquiry requires this court to determine whether the evidence reasonably supports the Board's conclusion, which in this case it does." *Id.* at 1299 (citation omitted).

Netlist raises another new argument on appeal when it asserts that two dies in Kim cannot share a TSV "[b]ecause Kim's [memory] dies *lack I/O circuits* of their own *to control signal timing*." Br. 41. There are two problems with this argument. First, Netlist's "focused attack on [Kim] does not undermine the Board's decision, which is based on a combination of references [including Rajan]." *Soft Gel Techs., Inc. v. Jarrow Formulas, Inc.*, 864 F.3d 1334, 1341 (Fed. Cir. 2017). Second, Netlist never made this argument to the Board, thus forfeiting it on appeal. *See, e.g.*, *In re Google*, 980 F.3d at 863. Netlist cites to its brief before the Board, *see* Br. 41 (citing Appx11424-29), but that brief actually shows the opposite of what Netlist now argues on appeal because it shows that *each* die has its *own* I/O circuit (labeled "I/O [Input/output] Driving Section"):

## FIG.2



Appx11425; *see also* Appx106 (same); Appx38 (same).

Next, Netlist argues that data collisions are "unavoidable" on shared data lines in Kim due to the allegedly missing "I/O circuits" in each memory die. Br. 41-42. Again, however, this is a new argument that Netlist has forfeited. In any event, the Board considered the "collision" argument that Netlist actually made based on the figure above, and the Board found Netlist's argument unpersuasive because Netlist improperly assumed the combination would have "four ranks but only ***two*** chip select signals" (CS0 and CS1, highlighted in green above), rather than ***four*** chip-select signals as Petitioner had actually proposed based on Rajan's teachings (shown above, p.34). *See* Appx106-08 (citing Appx9920 (320:12-:24)); Appx38-40 (same).

39

Netlist also argues that data collisions are "unavoidable" in any combination with Kim.  Br. 41 (quoting Appx3631 ¶ 42).[7]  The Board found to the contrary: "[W]e find persuasive Petitioner's contentions that persons of ordinary skill in the art knew how to deal with collisions."  Appx102; Appx34.  For example, as found by the Board, "Rajan . . . actually explains how to avoid collisions through the timing of various operations."  Appx105-06 (citing Appx3651-57, Appx3664-66 (8:59-12:13); Appx9800 (200:15-:19)); Appx37-38 (same); *see also* Appx6924-25 (69:24-70:18).

Netlist also argues that in Kim, the "rank-selecting circuit [1100] is critical" to avoiding a collision because it "functions like a switch."  Br. 41-42.  But the proposed combination of Kim and Rajan also includes a switch—which the Petitions referred to as a ***"fork-in-the-road"*** arrangement for implementing "rank multiplication"—where data is routed along one of the two data busses ("*die interconnects*") at a time, similar to a railroad switch, as shown above (p.34).  *See* Appx11058-59 (citing Appx12029 ¶ 165); Appx247-48 (citing Appx2083-84 ¶ 161); Appx10710.  The Board specifically rejected Netlist's argument that the

---

[7] Netlist also argues that "[t]he Board mentions data collisions ***only*** in connection with expectation of success."  Br. 43 n.6.  That is incorrect.  The Board addressed Netlist's argument that a POSITA "would not ***combine***" Kim and Rajan due to collisions at the same time as it addressed Netlist's related arguments about a lack of "reasonable ***expectation of success*** to modify Kim" due to collisions.  Appx102-09; Appx34-41.

proposed combination of Kim and Rajan did not include a "fork-in-the-road" switch. Appx137-38 ("[W]e also disagree with Patent Owner's assertions that 'fork in the road' is not in the Petition" (citing Appx1361-63 (70:11-72:17))); Appx62-63 (same).

### 2. The combination with Rajan does not "eviscerate" Kim's invention or purpose, and Netlist forfeited its arguments to the contrary

Second, Netlist introduces more new arguments on appeal by alleging that the proposed combination with Rajan "eviscerates" Kim's invention and "undermines" its purpose. Br. 43-47. But Netlist never made these sweeping arguments to the Board. *See* Appx11382-475 (no mention of "eviscerate" or "undermine"); Appx555-647 (same).

Netlist only raised a much narrower argument at the Board, which the Board considered and rejected. In particular, Netlist argued to the Board that the combination would render Kim "inoperative for its intended purpose" due to collisions. Br. 47 (citing Appx601-03; Appx11434-35). The Board expressly considered this argument by Netlist. *See* Appx102 ("Patent Owner argues [the proposed modifications] would result in inoperable apparatuses for Kim's intended purposes."); Appx34 (similar). And the Board rejected Netlist's argument because it "f[ou]nd persuasive Petitioner's contentions that persons of ordinary skill in the

41

art knew how to deal with collisions."  Appx102, Appx105-06; Appx34, Appx37-38.

Netlist now goes well beyond its argument to the Board, arguing for the first time on appeal that "Kim's 'invention'—i.e., its inventive concept—is a memory device where a centralized '[I/O] circuit' is 'share[d]' by all memory dies."  Br. 44. But Netlist never made this argument to the Board, thus forfeiting it on appeal.  *See, e.g.*, *In re Google*, 980 F.3d at 863.  In any event, Rajan also has a centralized, shared I/O circuit—contrary to Netlist's argument that the combination "eviscerates" Kim's invention—as shown below by the green "Buffer Chip" that connects one "Data" path below the buffer chip to **both** "Data" busses 415B and 415A (light green "*first die interconnect*" and teal "*second die interconnect*"), which are shared by all memory dies (orange and yellow), creating the "fork-in-the-road" arrangement, as recognized by the Board, Appx137-38; Appx62-63:



**FIG. 4**

Appx10747 (annotating Appx3646 and Appx3660); Appx3663-64 (6:30-7:67); Appx10710; Appx11054, Appx11056, Appx11058-59 (citing Appx12029 ¶ 165); Appx243, Appx245, Appx247-48 (citing Appx2083-84 ¶ 161).

Netlist's new "eviscerate" arguments essentially repeat Netlist's "teaching away" arguments discussed above: Netlist argues that the combination supposedly would cause "uncoordinated dies simultaneously loading data" resulting in "collisions," Br. 44 (citing Br. 38-41), which is the same argument addressed above that improperly assumes the combination has "four ranks but only two chip select signals," *supra* pp. 34-36, 38-39. Netlist argues that the combination with Rajan supposedly "would eliminate Kim's one-to-one correspondence," Br. 44 (citing Br.

43

38-41), which is the same argument addressed above that misreads Kim, *supra* pp.36-38. And Netlist argues that the combination with Rajan supposedly "would eliminate the switching/multiplexing function of [Kim's] rank-selecting unit," Br. 45 (citing Br. 40-41), which is the same argument addressed above, *supra* pp.40-41.

Netlist asserts that the combination would result in "collisions caused by sharing data lines before the lines meet the rank-selecting unit." Br. 45 (citing Appx3631 ¶ 42). But the Board considered and rejected this argument because it again improperly assumes the combination has four ranks but only two chip select signals, contrary to the actual combination where each chip has its own chip-select signal to avoid collisions as taught by Rajan (shown above, p.34):

> At deposition, Dr. Brogioli [Netlist's expert] confirmed that he "assume[d] that Kim's circuits would operate the same way as in Kim's original Figure 2."
>
> Dr. Brogioli's assumption of no change in operation with the addition of two ranks fails to account for the combined teachings of Kim and Rajan and the knowledge and skill of a person of ordinary skill in the art.

Appx107 (citing Appx9920 (320:5-:24) and *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1219 (Fed. Cir. 2016)); Appx39 (same).

Netlist argues for the first time on appeal that Rajan has "conventional" DRAM circuits each with its own "I/O circuit," while Kim's "unique memory dies" supposedly have no "I/O circuit," and thus, according to Netlist, this alleged difference in terms of "I/O circuits" "eliminates Kim's invention altogether" if

44

Rajan's teaching is used with Kim's memory dies. Br. 45-46. Netlist, however, never raised these arguments with the Board, as evidenced by Netlist's lack of any citation to the record. *Id.* Nor did Netlist argue to the Board that "putting individual I/O circuits back into Kim's dies abandons Kim's 'inventive concept' and 'principle of operation.'" *Id.* Thus, Netlist forfeited these arguments on appeal. *See, e.g.*, *In re Google*, 980 F.3d at 863. In any event, the Board found that Rajan expressly teaches compatibility with "any type of memory whatsoever," including Kim's memory, and thus "a person of ordinary skill in the art would have combined the teachings of Kim and Rajan in the manner asserted with a reasonable expectation of success." Appx109 (citing Appx3668 (15:3-:9)); Appx41 (same). And Netlist's new arguments about Kim's supposedly "unique" memory dies (Br. 45-46) are "based on attorney argument rather than record evidence," which "does not undermine substantial evidence that supports the Board's findings." *In re Riggs*, 131 F.4th 1377, 1386 (Fed. Cir. 2025).

The facts here are unlike the cases cited by Netlist where "modifying" a reference would "undermine" its "purpose" or "alter[]" its "inventive concept." Br. 43, 46-47 (citing *Medtronic, Inc. v. Teleflex Innovations, S.à.r.l*, 69 F.4th 1341, 1349 (Fed. Cir. 2023); *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1376 (Fed. Cir. 2021)). As found by the Board, "Petitioner's combination is a straightforward one — 'implement a shared data bus for multiple memory chips as

45

taught by Rajan . . . using, e.g., Kim's TSV interconnects.'"  Appx99-100 (quoting Appx11057); Appx31-32 (quoting Appx246).  That finding is consistent with *KSR*'s reasoning that "[c]ommon sense teaches . . . that familiar items [here, Kim's TSV interconnects] may have obvious uses beyond their primary purposes."  *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800-01 (Fed. Cir. 2021) (quoting *KSR*, 550 U.S. at 420).

### 3. The Board's findings about the motivations to connect multiple memory dies to Kim's TSVs were not "generic," and Netlist forfeited any argument to the contrary

Third, Netlist argues for the first time that the Board's reasoning was too "generic" to find a motivation to "connect [multiple] memory dies to Kim's TSV1 and TSV2."  Br. 47-49 (quoting Appx101; Appx33).  But Netlist never argued to the Board that the proposed motivation to combine was too "generic," *see* Appx11383-84, Appx11412-40; Appx556-57, Appx585-616, thus forfeiting the argument on appeal, *see, e.g.*, *In re Google*, 980 F.3d at 863.

In any event, the Board's analysis was detailed and extensive, spanning dozens of pages, *see* Appx93-109; Appx25-41, almost all of which Netlist's argument ignores, *see* Br. 47-49.  According to Netlist, the entirety of the Board's analysis rested on the "generic" motivation to "avoid needing to '"create[e] new TSVs."'"  Br. 47 (quoting Appx101; Appx33).  But Netlist ignores that the Board relied on much more than that, including:

46

- Kim expressly states that "***any number*** of … [memory] chips may be used" in its stack, and thus the Board agreed with Petitioner's expert "that Kim's disclosure suggests having ***more*** than the two chips depicted in Figure 5 [above p.28]," and this disclosure "would have ***motivated*** a person of ordinary skill in the art 'to look at Rajan for details about adding more memory chips in the stack (resulting, e.g., in four chips . . . in two groups . . . [satisfying the claim language, as shown above, p.26])."    Appx93-94 (citing Appx3631-32 ¶¶ 48, 50; Appx12025-26 ¶¶ 158-60); Appx25-26 (same, citing also Appx2080-81 ¶¶ 154-56).

- "Patent Owner ***does not dispute*** Petitioner's contention [Appx11057 (citing Appx12026-28 ¶¶ 161-63; Appx3663 (5:36-:43), Appx3644-48 (Figs.2-6))] that there are a ***finite*** number of known ways to connect additional dies, one of which being to have dies ***share*** a TSV" as shown by the Foster reference [shown above, p.31].  Appx94-96 (annotating Appx4645 (Fig.5) and citing Appx4649 (2:53-:56), Appx4652 (7:28-:54)); Appx27-28 (same, citing also Appx246; Appx2081-83 ¶¶ 157-59).

- "Petitioner's combination is a straightforward one — 'implement a shared data bus for multiple memory chips as taught by Rajan . . . using,

e.g., Kim's TSV interconnects'" and "a person of ordinary skill in the art would have been motivated to implement [this combination] . . . in part because a [POSITA] would have understood that there were a finite number of known ways to connect additional dies, including having a subset of dies sharing a through-silicon via (TSV)."   Appx99-100; Appx31-32; *KSR*, 550 U.S. at 421 ("finite number").

- The Board "d[id] not credit" the testimony of Netlist's expert and found his testimony "not helpful."  Appx98-99; Appx30-31.

- The Board "f[ou]nd persuasive" the testimony of Petitioner's expert that a POSITA "would have been motivated to connect additional memory dies to Kim's TSV1 and TSV2 because it would not require creating new TSVs (which would add space and circuitry)."  Appx101 (crediting Petitioner's expert, Appx12028 ¶ 164); Appx33 (same, crediting Appx2083 ¶ 160).

As shown above, and contrary to Netlist's arguments, the Board explained in detail the motivations to pursue "***the particular modifications*** required to achieve the claimed invention," Br. 48, and the Board did not merely identify what a POSITA "***could have made***," but what they "***would have been motivated to make***," *id.*, in view of the prior art including Rajan and the finite number of known solutions.

48

In a footnote, Netlist argues that the Board's motivations above do not apply "in the context of Kim's unique shared-I/O-die architecture," Br. 48 n.7, but Netlist never raised that argument with the Board, thus forfeiting the argument on appeal, *see, e.g.*, *In re Google*, 980 F.3d at 863.  In any event, Rajan has a shared I/O circuit, like Kim, as explained above (pp.42-43), and neither Kim nor Rajan is limited to any specific types of memory dies, contrary to Netlist's belated argument, *see* Appx109 (citing Appx3668 (15:3-:9) ("any type of memory whatsoever")); Appx41 (same).

### 4. Substantial evidence supports the Board's findings that data collisions were avoidable, as expressly taught by Rajan

Fourth, Netlist incorrectly asserts that "[t]he Board did not dispute that connecting multiple of Kim's memory dies to each TSV would reintroduce data collisions" and that the Board's analysis rested on the assumption "that data collisions were not a problem."  Br. 49-51.

To the contrary, the Board extensively addressed Netlist's arguments about "collisions," *see* Appx102-09, Appx136-39; Appx34-41, Appx62-64, and found that:

- POSITAs "knew how to deal with collisions."  Appx102; Appx34.

- "Rajan . . . actually explains how to ***avoid*** collisions through the timing of various operations."  Appx105-06 (citing Appx3651-57, Appx3664-66 (8:59-12:13); Appx9800 (200:15-:19)); Appx37-38 (same).

- "[T]he ['060/'160] patent does not provide any particular details on how to control timing to reduce or prevent collisions, suggesting that this was within the knowledge and skill of a person of ordinary skill in the art." Appx103 (citing Appx191 (21:39-:56)); Appx35-36 (citing Appx168 (21:24-:41)).

- Netlist's collision arguments improperly assumed that the combination would have "four ranks but only two chip select signals" (i.e., "no change in [Kim's] operation with the addition of two ranks"), which the Board found "fail[ed] to account for the combined teachings of Kim and Rajan and the knowledge and skill of a person of ordinary skill in the art." Appx107 (citing *ClassCo*, 838 F.3d at 1219); Appx39 (same). As shown above (p.34), and found by the Board, "Rajan teaches rank multiplication by generating chip select signals for *each* chip in the stack." Appx107-08 (citing Appx3663 (6:34-:38)); Appx39-40 (same).

Furthermore, the Board did not assume "that data collisions were not a problem" as Netlist argues. Br. 49. Instead, the Board explained that the '060/'160 patents merely refer to "*reducing or* preventing signal collisions," thus placing "no prohibition on signal collisions," as confirmed by the fact that the claims do not require that collisions must be entirely avoided. Appx102-03 (emphasis by the Board); Appx34-35 (similar). Netlist itself tacitly concedes that "some collisions

could be tolerated (through error-correction or otherwise)." Br. 51. Thus, the Board correctly held that Netlist's suggestion that ***any*** data collisions would make the combination inoperable was "not commensurate in scope with the claims." Appx103 (citing Appx6463-64 ¶ 150); Appx35 (same). The Board, however, did take into account the issue of collisions for the motivation to combine, as discussed directly above, and the Board found that Rajan expressly taught how to avoid collisions, contrary to Netlist's argument that a POSITA "would not ***combine***" Kim and Rajan due to "unavoidable data collisions." Appx102-09, Appx136-39; Appx34-41, Appx62-64.

### B. Substantial evidence supports the Board's findings about the reasonable expectation of success in combining Kim and Rajan without data collisions

Next, Netlist challenges the Board's findings about the "reasonable expectation of success" in combining Kim and Rajan without data collisions. Br. 51-55. Netlist's arguments are a rehash of the arguments above about collisions, and thus incorrect for the same reasons explained above (pp.33-51). When the Board rejected Netlist's argument that a POSITA "would not ***combine***" Kim and Rajan due to collisions, the Board also addressed Netlist's related arguments about a lack of "reasonable ***expectation of success*** to modify Kim" due to collisions. Appx102-09; Appx34-41. It was permissible for the Board to consider both issues together: "[T]he evidence establishing a motivation to combine may establish a finding of

reasonable expectation of success." *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1377 (Fed. Cir. 2023).  The following pages above (with citations to the Board's findings) address Netlist's arguments about the expectation of success:

- Pages 38-39 and 44-45 above address Netlist's argument that Kim's memory dies supposedly "lack dedicated I/O circuits," Br. 51; *see also* Br. 52, 53, 54, 55.

- Pages 41-42 and 49-51 above address Netlist's argument that the combination supposedly would result in collisions and thus be "inoperable," Br. 51; *see also* Br. 52.

- Pages 40-41 and 42-43 above address Netlist's argument that the combination supposedly "eliminates the separate . . . data lines and . . . the switch" in Kim, Br. 52; *see also* Br. 53.

- Pages 50-51 above address Netlist's argument that the Board supposedly "thought that the resulting data collisions are acceptable," Br. 52.

- Pages 40-41, 42-43, and 44-45 above address Netlist's argument that Rajan's "timing solutions" to collisions supposedly would not work "with ***Kim's*** unique architecture," Br. 52-53, 54.

In addition to the flaws discussed directly above, Netlist's arguments about expectation of success ignore the undisputed level of skill, which includes familiarity

with the "*JEDEC*" standards as well as "*stacked* memory devices." Appx75-77; Appx7-9. As discussed previously, the JEDEC standards avoid collisions by providing programmable "latency" parameters (e.g., 5, 6, 7, 8, or 9 clock cycles) that are used to fine-tune the timing for read and write operations, *see supra* pp.3-7, and the JEDEC standards provide a "chip-select" (CS) signal to select only *one* memory device in a stack at a time, thus avoiding collisions on shared data lines, *see supra* pp.5-7. Rajan teaches how to use both of those standard JEDEC technologies to avoid data collisions, which is why the Board concluded that "Rajan . . . actually explains how to *avoid* collisions through the timing of various operations." Appx105-06 (citing Appx3651-57, Appx3664-66 (8:59-12:13); Appx9800 (200:15-:19)); Appx37-38 (same); *see also supra* p.34 (showing Rajan teaches a separate chip-select signal for each memory chip in the stack, Appx3663 (6:34-:38)).

Netlist argues that "[t]he AIA and APA precluded the Board from finding obviousness" based on portions of Rajan that "the 'Petition' did not rely on." Br. 53 (citing *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1002 (Fed. Cir. 2023)). But that is not what happened. Netlist ignores that the Petitions discussed avoiding "collisions," *see* Appx11038, Appx11058-59, Appx11078; Appx225, Appx247-48, Appx283, and in Reply, "Petitioner's arguments that there were known solutions to data collision issues [we]re directly responsive to Patent Owner's collision arguments," and thus were proper, as found by the Board and not challenged by

Netlist on appeal, *see* Appx138 (citing *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1385 (Fed. Cir. 2023)); Appx63-64 (same); *see also Corephotonics*, 84 F.4th at 1009-12 (permitting "new evidence" that is an "expan[sion] on and... fair extension of ... [a] previously raised ... argument" and "has a 'nexus' (and is therefore responsive) to an argument made by the patent owner").

Netlist tries to downplay the lack of any "details" about avoiding collisions in the '060/'160 patents, arguing that its patents "nowhere mention[] . . . sharing I/O circuits" like Kim.  Br. 54.  Not true.  The '060/'160 patents both disclose and ***claim*** shared I/O circuits, as Netlist itself has argued.  *See* Appx918 (The "[f]irst die interconnect and second die interconnect [are] coupled to the ***same*** 'first [data] terminal.'" (quoting Appx192 (24:6-:11))); Appx11467 (similar); Appx919 (similar for '160 patent); Appx638 (similar).  Furthermore, the '060/'160 patents are not limited to "conventional" array dies as suggested by Netlist, Br. 54, but instead teach that the "array dies . . . may include ***any*** type of Random Access Memory (RAM) die," Appx191 (22:1-:2).  Yet the '060/'160 patents do not disclose any particular solutions to the collisions that would be caused by the shared I/O circuit, as found by the Board.  Appx103 (citing Appx191 (21:39-:56)); Appx35-36 (citing Appx168 (21:24-:41)).  Instead, Netlist's patents simply incorporate by reference admitted prior art such as U.S. Patent Nos. 7,619,912 and 7,532,537, Appx182 (4:11), Appx190 (19:45-:46), which teach "insert[ing] wait-time intervals or clock cycles to

avoid collision," Appx9879-80 (279:16-280:6); *see also* Appx4886 (21:28-:53), similar to what the JEDEC standards and Rajan taught in the prior art for avoiding collisions, *see* Appx105-06 (citing Appx3651-57, Appx3664-66 (8:59-12:13); Appx9800 (200:15-:19)); Appx37-38 (same).

Finally, Netlist alleges that the Board only "cryptically suggested" that "Rajan's teachings regarding '"rank multiplication"' . . . would solve Kim's problem." Br. 54-55. The Board's reasoning was clear: the Board found that "Rajan teaches rank multiplication by generating chip select signals for *each* chip in the stack." Appx107-08 (citing Appx3663 (6:34-:38)); Appx39-40 (same). And the use of a separate chip-select signal for each chip in the stack, as taught by Rajan (and the JEDEC standard as discussed above, pp.5-7), prevents collisions, contrary to Netlist's improper assumption that the combination would have "four ranks but only two chip select signals" resulting in collisions. Appx107 (citing *ClassCo*, 838 F.3d at 1219); Appx39 (same).

## III.    Claim 7 of the '060 Patent

Turning to dependent claim 7 of the '060 patent, Netlist argues that the Board's invalidity findings depended on "misconstruing claim 7," and that the Board's "analysis of motivation to combine and expectation of success falls far short." Br. 55-64. But Netlist forfeited its new claim construction argument, which is incorrect anyway, and substantial evidence supports the Board's findings.

55

**A.    Netlist forfeited its new claim construction argument, which is incorrect anyway and would exclude a preferred embodiment**

Claim 7 of the '060 patent requires that the number of array dies on each die interconnect is selected "so as to reduce a difference between a first ***load*** on the ***first data conduit*** and a second ***load*** on the ***second data conduit***."  Appx192 (24:37-:47).  Netlist now argues for the first time on appeal that claim 7 should be construed to require that "the loads on the first and second data conduits must be '***different***' or 'unlike' ***to start with***, rather than the same or alike."  Br. 58.

Netlist forfeited its new claim construction argument by failing to raise it with the Board.  *See, e.g.*, *IOENGINE, LLC v. Ingenico Inc.*, 100 F.4th 1395, 1402 (Fed. Cir. 2024) ("[Appellant] forfeited its proposed claim construction by not presenting it to the Board during IPR"); *In re Google*, 980 F.3d at 863 ("Because [appellant] failed to present these claim construction arguments to the Board, [appellant] forfeited both arguments.").

Netlist raised other claim construction arguments with the Board under the heading "Claim Construction," but conspicuously absent from Netlist's brief was any claim construction argument for claim 7.  Appx11383, Appx11407-11.  Netlist now points to a ***single sentence*** about claim 7 in its brief to the Board, which stated: "The '060 patent teaches that because loads of TSVs ***could*** be significant, the number of array dies in a group ***might*** need to be adjusted to account for the TSV load, in order to achieve load balancing on different data conduits."  Appx11445

56

(citing Appx187 (Table 1 and 14:3-:11)); Br. 57 ("That is what the claim means . . . ."). That is hardly a claim construction argument. What the '060 patent "teaches" is not a claim construction for what claim 7 requires, and it is too late for Netlist to raise its claim construction argument now.

Indeed, neither Petitioner nor the Board understood Netlist to have raised any claim construction argument for claim 7. Claim construction was not mentioned in Petitioner's Reply, Netlist's Sur-Reply, or during the three-hour oral argument to the Board. Appx11554-56; Appx11615-17; Appx1294 (3:25). In the Final Written Decision, the Board construed other limitations but not claim 7. Appx77-80. And in its analysis of claim 7, the Board did not purport to construe the claim. Appx123-26 & n.13.

This Court has found forfeiture in a similar fact pattern:

> [N]either party proposed a construction for the term at issue, and neither party briefed a construction for this term before the Board. Generally, absent exceptional circumstances, we will not consider on appeal claim construction arguments that were not first presented to the Board.
>
> [Appellant] argues that it has not forfeited its claim construction arguments because the Board construed the 'each strand' limitation in its final written decision inconsistently with the plain and ordinary meaning of the term after both parties had relied on the plain and ordinary meaning throughout the proceedings below. However, the Board was only applying the plain and ordinary meaning of the challenged claims which nowhere reference 'complete elimination of short amplicons.' To the extent that [Appellant] thinks that complete elimination of short amplicons is

required . . . [Appellant] was required to raise those arguments to the Board to preserve them on appeal.

*Integrated DNA Techs., Inc. v. Pillar Biosciences, Inc.*, No. 22-2172, 2024 WL 5182912, at *3 (Fed. Cir. Dec. 20, 2024) (citations omitted). Here, the Board simply applied the plain and ordinary meaning of claim 7, which, as the Board observed, "does not recite any particular amount of reduction of load difference nor the starting point from which to determine whether there is a reduction." Appx126.

Netlist's belated claim construction arguments were not only forfeited, they are also incorrect. Netlist's construction would transform claim 7 into a product-by-process claim by requiring "a '***difference*** between [the] . . . load[s]' of the data conduits—such as from die interconnects having different lengths—***before*** the number of array dies is 'selected.'" Br. 57-58. But as found by the Board, "[n]either party asserts that this is a product-by-process claim," Appx 124 n.13, and claim 7 "does not . . . recite the starting point from which 'to reduce a difference between' loads." Appx124.

Netlist's belated construction would also improperly rewrite claim 7 to require die interconnects with "different ***lengths***" (and thus different loads). Br. 57. But claim 7 states only that the number of dies are selected "in consideration of a load of the first die interconnect and a load of the second die interconnect." Appx192 (24:37-:47). It does not state or require that the "first die interconnect" be of a different ***length*** (or load) than the "second die interconnect." *Id.* Netlist points to

58

Table 1 of the patent showing die interconnects with different lengths, *see* Br. 59, but this Court has "consistently advised against" limiting claims to a particular embodiment in the patent. *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907-08 (Fed. Cir. 2005).

In fact, Netlist's belated construction would improperly exclude from the scope of claim 7 a preferred embodiment where the die interconnects have the same length and load. As Netlist concedes, the "load" on a data conduit (e.g., 232a or 232b below, at the bottom of the stack) "includes the load from the die interconnect itself (which depends on its length) [e.g., light green or teal below] *plus* the load imposed by array dies in electrical communication with that interconnect [e.g., yellow or orange below]." Br. 55.



Array Dies 210c and 210d (orange)

Die interconnect 220b (teal)

Array Dies 210a and 210b (yellow)

Die Interconnect 220a (light green)

Drivers 234 (for data)

FIG. 2

The control die **230** may include a number of data conduits **232**, which includes data conduits **232***a* and **232***b*. Each of these data conduits **232** may be configured to transmit a data signal to a single die interconnect **220**. For example, the data

Appx10684 (annotating Appx174, Appx183 (6:48-:51)); Appx11041-43 (similar).

The '060 patent calculates the overall load on a data conduit by adding the load from each segment of the die interconnect (e.g., 0.25L) ***plus*** the load from each array die (e.g., 1L), meaning in Figure 2 above, "the load on the data conduit 232*a* in this example is 2.5 [i.e., $(2 \times 0.25) + (2 \times 1)$] and the load on the data conduit 232*b* in this example is 3 [i.e., $(4 \times 0.25) + (2 \times 1)$]." Appx184 (7:43-:51). The same is true in Figure 3, as shown by the annotation below of Table 1 (which is the same table that Netlist cites, Br. 59):

60



| | 1L load / die | 0.25L load / segment of die interconnect | | |
|---|---|---|---|---|
| Conduit | Number of Array Dies | Number of Die Interconnect Segments | Capacitive Load | Deviation from Maximum Load |
| 332a | 2 | 2 | 2.5 L | 0.5 |
| 332b | 2 | 4 | 3 L | 0 |

Appx10681 (annotating Appx187 (13:6-:18)).

Neither the examples above nor claim 7 precludes *equal* loads on the first and second data conduits, nor do they preclude an *equal* number of array dies and/or an *equal* number of die interconnect segments (i.e., length). In fact, contrary to Netlist's belated claim construction, the '060 patent expressly discloses that

> [i]n some implementations, the difference between the load of the data conduit 232a and the load of the data conduit 232b is *zero or substantially zero*. In some embodiments, the *length* of each die interconnect 220, *and the number* of array dies 210 in electrical communication with each die interconnect 220 *may be selected to maintain the difference between the load* of the data conduit 232a and the load of the data conduit 232b to be at or below a threshold load difference.

Appx184 (7:35-:43). In addition, the '060 patent discloses that "the load on each conduit 332 . . . may be *evenly balanced*. . . . This difference in the load of the conduits . . . may be a design decision . . . ." Appx187 (14:4-:17). Those disclosures are contrary to Netlist's claim construction requiring that "the loads on the first and second data conduits must be '*different*' or 'unlike' *to start with*, rather than the same or alike." Br. 58. The '060 patent does not require starting with any particular

length for any die interconnect, or any particular number of array dies, and permits the difference in load to be "zero" (or "evenly balanced") as quoted above. Thus, claim 7 permits die interconnects that are the same length, in which case "reduc[ing] a difference" between the loads on the data conduits may require "select[ing]" an *equal* "number of array dies" for each die interconnect—since selecting an unequal number of array dies would *increase* the difference between the loads on the two data conduits.

For example, as taught by Table 1 of the '060 patent below, regardless of whether the number of "die interconnect segments" for 332a is 2, 3, or 4 (in other words, regardless of whether it is different than or the same as the number of die interconnect segments for 332b, i.e., 4), there would still need to be an *equal* number of array dies (i.e., 2 array dies) to "reduce a difference" between the loads on the two data conduits (e.g., 2.5L vs. 3L):



| | 1L load / die | 0.25L load / segment of die interconnect | | |
|---|---|---|---|---|
| Conduit | Number of Array Dies | Number of Die Interconnect Segments | Capacitive Load | Deviation from Maximum Load |
| 332a | 2 | 2 | 2.5 L | 0.5 |
| 332b | 2 | 4 | 3 L | 0 |

Appx10681 (annotating Appx187 (13:6-:18)). For example, if 332a above were to have 4 die interconnect segments just like 332b, then there would still need to be an

*equal* number of array dies (i.e., 2 array dies) to "reduce a difference" between the loads (i.e., 3L vs. 3L in this example). Otherwise, for example, selecting 1 array die for 332a (with 4 die interconnect segments), while selecting 3 array dies for 332b (with 4 die interconnect segments), would *increase* the difference in load (i.e., 2L vs. 4L in this example). *See also* Appx184 (7:30-:62) (similar example, where selecting an unequal number of array dies, rather than an equal number, would increase the difference in load from 0.5L to 2.75L).

Thus, the '060 patent teaches that regardless of whether the number of die interconnect segments (i.e., length) is the same or different, "reduc[ing] a difference" between the loads on the data conduits may require "select[ing]" an *equal* "number of array dies" for each die interconnect—contrary to Netlist's claim construction argument that precludes an equal number of array dies and an equal number of die interconnect segments (i.e., length), *see* Br. 56-59. "A claim construction [such as Netlist's construction] that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022).

## B. Substantial evidence supports the Board's finding that the combination of Kim, Rajan, and Riho taught claim 7 of the '060 patent

In any event, substantial evidence supports the Board's finding that the combination of Kim, Rajan, and Riho taught claim 7 of the '060 patent, *see*

Appx120-26, and that is true even under Netlist's belated claim construction, meaning that Netlist has failed to "demonstrate the harmfulness of the alleged error" in the Board's analysis, *Bot M8 LLC v. Sony Interactive Ent. LLC*, 66 F.4th 1380, 1385 (Fed. Cir. 2023) (citing 5 U.S.C. § 706 ("rule of prejudicial error")).

Netlist does not challenge the Board's findings for claim 7 using the plain and ordinary meaning of the claim language (i.e., without Netlist's belated claim construction). *See* Br. 60-62; Appx120-26. Rather, Netlist argues that "*Riho* cannot teach" claim 7 "[o]nce claim 7 *is properly construed*." Br. 60-62. But Netlist ignores that claim 7 was not found obvious based on just Riho, but rather the *combination* of Kim, Rajan, and Riho. *See* Appx126 ("[C]laim 7 is unpatentable as obvious over the *combined* teachings of Kim, Rajan, and Riho for the reasons discussed above and given by Petitioner."); Appx11110-12; Appx11554-56. Thus, Netlist's "focused attack on [Riho] does not undermine the Board's decision, which is based on a combination of references [including Kim and Rajan]." *Soft Gel Techs.*, 864 F.3d at 1341.

In particular, Netlist argues that "Riho [alone] discloses using an *equal* number of dies in each group as part of its structure of using *equal* length TSVs," Br. 60, which Netlist contends does not satisfy its belated construction for claim 7 requiring "the loads on the first and second data conduits must be '*different*' or 'unlike' *to start with*, rather than the same or alike," Br. 58. But Netlist ignores that

Kim and Rajan—the primary references in the combination for claim 7—disclose loads on the first and second data conduits that *are* "different" to "start with" (before the combination with Riho), given the *unequal* lengths of the two "die interconnects" as shown below, thus satisfying even Netlist's belated construction for claim 7:



Appx85 (reprinting Appx11068 (annotating Rajan, Appx3646)); Appx110 (reprinting Appx11070 (annotating Kim, Appx3627)); *see also* Appx11444 (Netlist admitting that "[i]n Kim, the TSVs are of *different* lengths"). Furthermore, given Kim's teaching that "*any number*" of array dies may be connected to a given TSV, Appx93 (quoting Appx3631 ¶ 48), the combination of Rajan and Kim may have an *unequal* number of array dies connected to each die interconnect, as was taught in the prior art:



Appx11066-67 (annotating Appx4622, Appx4631-32 (8:58-9:18), which teaches *three* array dies connected to the first die interconnect 12b, and *two* array dies connected to the second die interconnect 12a); Appx12056-58 ¶¶ 219-20 (same); *see also* Appx51-52 (finding "asymmetrical" stack obvious in light of Kim and Rajan, Appx3661 (2:62-:65)).

As shown above, Netlist cannot "demonstrate the harmfulness of the alleged error" in the Board's analysis, *Bot M8*, 66 F.4th at 1385, because adding Riho to the combination of Kim and Rajan satisfies Netlist's proposed construction: "the loads on the first and second data conduits [in Kim and Rajan] [are] '*different*' or 'unlike' *to start with*, rather than the same or alike," Br. 58, and adding Riho to the combination teaches claim 7 as found by the Board, *see* Appx125 (finding that Riho teaches "dividing chips into a plurality of groups and sharing TSVs mak[ing] it 'possible to *reduce the load of the interconnections* . . .'" (quoting Appx3681 ¶ 13, and citing Appx3688 ¶ 103)); Appx125 ("Riho's die grouping teaches that numbers of dies are selected for groups based on load considerations . . . . [E]ven if the

proposed combination uses Kim's unequal length TSVs, Riho still provides a teaching of considering load when grouping dies, as discussed above.").  As shown below, Riho teaches a stack of 16 chips with TSVs that are all approximately ***equal*** in length, but only a smaller group of chips (e.g., ***two*** chips, orange or yellow) are selected for each TSV, thus reducing the load on each TSV, as found by the Board above:



Appx121 (annotating Appx3674 (Fig.4)); Appx11555-56.  Netlist itself concedes that "Riho . . . teaches '***equal*** length' TSVs with an '***equal*** number' of dies connected to each," Br. 56 (quoting Appx125), thus "minimizing skew (timing differences)" between TSVs, Br. 61, which when combined with Kim and Rajan satisfies claim 7 by reducing the difference in load on Kim/Rajan's two data conduits, even under Netlist's belated claim construction.

**C.    Substantial evidence supports the Board's findings on the motivation to combine Riho with Kim and Rajan with a reasonable expectation of success**

Netlist also challenges the Board's findings on the motivation to combine Riho with Kim and Rajan with a reasonable expectation of success.  *See* Br. 62-64; Appx120-26.  However, substantial evidence supports the Board's findings.

First, Netlist argues the Board "failed to explain" its reasoning.  Br. 62-63. Netlist relies on *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1047 (Fed. Cir. 2017), which in turn quotes *In re NuVasive*, 842 F.3d 1376, 1383 (Fed. Cir. 2016).  But those cases are distinguishable because "the Board's decisions here [*see, e.g.*, Appx121-23 ('agree[ing] with Petitioner' and 'disagree[ing] with [Netlist's] argument'), Appx125 ('[w]e agree with Petitioner' and '[w]e disagree [with Netlist]"), Appx126 ('for the reasons discussed above and given by Petitioner')] cite to the relevant portions of [Petitioner's] briefing that explain how the prior art discloses the relevant claim limitations.  In this context, the Board's analysis is readily discernible and sufficient under *Chenery*."  *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 905-06 (Fed. Cir. 2018) (citation omitted).

Next, Netlist argues that the Board "failed to address" Netlist's arguments about the combination for claim 7 "increasing cost."  Br. 63 (citing Appx11442, Appx11472-73).  But Netlist never made this argument to the Board for claim 7, thus forfeiting it on appeal.  *See, e.g.*, *In re Google*, 980 F.3d at 863.  Netlist only

made a "cost" argument for other claims with different limitations. *See* Appx11440-42, Appx11472-73 (claims 6, 11, 20, 29 requiring "chip-select" conduits and signals). And the Board considered and rejected Netlist's "cost" argument for those other claims, because "the use of TSVs was an obvious option for a person of ordinary skill in the art [as shown by Kim, *see, e.g.*, Appx110, and Foster, *see, e.g.*, Appx95], notwithstanding Patent Owner's commercial viability arguments." Appx113-14. Netlist does not challenge that finding on appeal.

Netlist also complains about the Board supposedly being "self-contradictory" when finding that "even if the proposed combination uses Kim's ***unequal*** length TSVs, Riho still provides a teaching of considering load when grouping dies." Appx125; *see* Br. 63-64. But as explained above, substantial evidence supports the Board's finding that Riho's "teaching of considering load when grouping dies" applies to the combination of Kim and Rajan (which start with unequal length die interconnects). *See supra* pp.64-67 (discussing Appx125-26); *see also* Appx121-23 (finding motivation to combine). "[T]he motivation to modify a prior art reference to arrive at the claimed invention need not be the same motivation that the patentee had." *Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345, 1353 (Fed. Cir. 2025). And an obvious combination does not have to be the "best" option, just a "suitable" option. *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380-81 (Fed. Cir. 2023).

69

**IV.  Substantial evidence supports the Board's findings for claim 15 of the '060 patent**

Dependent claim 15 of the '060 patent—and claims with similar limitations such as claim 1 of the '160 patent—require "first" and "second" "driver[s]" with "first" and "second" "driver size[s],"[8] which the Board found was taught by the combination of Kim, Rajan, and Wyman.  Appx126-35; Appx42-50.  Netlist does not challenge the Board's finding that in this combination—which does not involve Riho—the *different* lengths of Kim/Rajan's TSVs provide a motivation to use "*different* amounts of signal drive" as taught by Wyman (as discussed above, pp.15-17).  Appx130 (rejecting Netlist's arguments at Appx129-30); Appx50 (rejecting Netlist's arguments at Appx44-45).  Instead, Netlist argues on appeal that Wyman supposedly only teaches "a *single* adjustable driver circuit—not multiple driver circuits of differing sizes," and using only a "*single* driver circuit to drive multiple TSVs—not assigning each die interconnect its own separate driver."  Br. 65-68.

Substantial evidence supports the Board's findings that Wyman teaches that "physically *separate* drivers can be used to provide . . . different amounts of signal drive."  Appx134 (rejecting Netlist's arguments at Appx130-34); Appx50 (rejecting Netlist's arguments at Appx45-50).  The Board found that Wyman taught—as an

---

[8] Netlist incorrectly states that claim 15 of the '060 patent requires that the "first" and "second" driver sizes are different.  Br. 64-65.  Only the claims of the '160 patent require "different" driver sizes.  *Compare, e.g.*, Appx192-94, *with* Appx169-70 (24:2, 24:48, 25:16).

alternative to a ***single*** driver with "different taps" providing "different drive levels"—simply using "a conventional drive circuit" in which "taps are ***not*** used." Appx133-34 (citing Appx3705 (5:34-:44)); Appx49 (same).  The Board credited the testimony of Petitioner's expert that Wyman therefore teaches that "you can provide a ***separate*** copy of [Wyman's] circuit 500 for each thing that needs to be driven after you analyze the current requirements."  Appx132 (quoting Appx6984 (129:2-:7)); Appx47 (same).

Thus, the Board agreed with Petitioner's proposed combination involving "***separate*** drivers in [the] annotation of Kim's Figure 3," shown below as triangles in navy blue (i.e., smaller driver for the shorter die interconnect) and dark green (i.e., larger driver for the longer die interconnect).  Appx132; Appx47.



71

Appx128 (reprinting Appx11115, Appx11117 (annotating Appx3625)); Appx43 (reprinting Appx250, Appx266 (similar)).   The Board found "no patentable distinction between whether the different amounts of drive come from *one* set of transistors that can be tapped for different drive strengths or from *two* different sets of transistors."  Appx132 (citing *In re Harza*, 274 F.2d 669, 671 (CCPA 1960) ("no patentable significance")); Appx47 (same).  "That physically *separate* drivers could be used to produce *different* amounts of drive in *different* paths [as shown above] is an unremarkable observation."  Appx133; Appx48.

On appeal, Netlist repeats the arguments that the Board already considered and rejected.  Br. 65-68.  Netlist argues that Wyman discloses an embodiment with a *single* driver with selectable power levels that could be used instead of multiple drivers.  *Id.*  But the Board concluded that this was just one option, and that another option taught by Wyman was using separate drivers for the separate TSVs, as discussed above.  Appx131-33; Appx46-48.  Netlist points to the testimony of its expert, *see* Br. 65-68, but the Board considered that testimony, *see* Appx131-32 (citing Appx6501-03 ¶¶ 213-15); Appx46-47 (same), and the Board decided to credit the testimony of Petitioner's expert instead as discussed above.

"[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, [the PTAB]'s decision to favor one conclusion over the

72

other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Cree, Inc.*, 818 F.3d 694, 701 (Fed. Cir. 2016).

## V.    The Board's analysis of undisputed claim limitations was proper

Finally, Netlist argues for a remand based on the Board's agreement with Petitioner's analysis of claim limitations that Netlist concedes it "d[id] not dispute." Br. 68-69.  But as discussed above, the cases cited by Netlist are distinguishable because the Board's decision here (e.g., Appx15-16, Appx51-57; Appx83, Appx94-96, Appx109-11, Appx114-20, Appx122, Appx135) cites to the relevant portions of Petitioner's briefing that the Board agreed with.  *See supra* p.68 (citing *Paice*, 881 F.3d at 905-06).

Furthermore, given that Netlist presented no arguments for these undisputed limitations, this Court should not "find fault in the Board's arguably limited treatment" of those limitations where the Board's treatment "was at least commensurate" with the Netlist's presentation for those limitations, even if "the Board's reasoning could have been more thorough." *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1066-67 (Fed. Cir. 2018).

In any event, Netlist's opening brief on appeal fails to "demonstrate the harmfulness of the alleged error," *Bot M8*, 66 F.4th at 1385, thus failing to offer a timely challenge to this Court, *see Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1415 n.6 (Fed. Cir. 2022).

73

## <u>CONCLUSION</u>

For the foregoing reasons, Appellees respectfully request the Court to affirm the Board's obviousness determination for claims 1-34 of the '060 patent under Grounds 1-3, and claims 1-20 of the '160 patent under Ground 1.  Otherwise, Appellees respectfully request remand for the Board to consider in the first instance the patentability of those claims in light of '060 Grounds 4-5 and '160 Ground 2.

Dated: April 16, 2025

Respectfully submitted,

*/s/ Michael Hawes*
Michael Hawes
Lori Ding
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1234 (telephone)
michael.hawes@bakerbotts.com
lori.ding@bakerbotts.com

Eliot Williams
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
(202) 639-7700 (telephone)
eliot.williams@bakerbotts.com

Theodore W. Chandler
BAKER BOTTS L.L.P.
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
(213) 202-5702 (telephone)
ted.chandler@bakerbotts.com

*Attorneys for Samsung Electronics Co., Ltd.*

Michael R. Rueckheim
WINSTON & STRAWN LLP
225 Shoreline Drive, Suite 520
Redwood City, CA 94065
(650) 858-6500 (telephone)
MRueckheim@winston.com

Juan Yaquian
WINSTON & STRAWN LLP
800 Capitol St., Suite 2400,
Houston, TX 77002-2925
(713) 651-2645 (telephone)

jyaquian@winston.com

*Attorneys for Micron Technology Inc.,
Micron Semiconductor Products, Inc.,
and Micron Technology Texas, LLC*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-2240, 2024-2241

**Short Case Caption:** Netlist, Inc. v. Samsung Electronics Co., Ltd.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,992 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/16/2025

Signature: /s/ Michael Hawes

Name: Michael Hawes

Save for Filing